### David Lee GOFF, Appellant

v.

### The STATE of Texas, Appellee.

### No. 71404.

Court of Criminal Appeals of Texas,
En Banc.

May 22, 1996.

Rehearing Denied Oct. 16, 1996.

538

David Richards and Bob Ford, Fort Worth, for appellant.

John A. Stride, Asst. Dist. Atty. Fort Worth and Robert A. Huttash, State's Atty., Austin, for the State.

## OPINION

MEYERS, Judge.

In November 1991, appellant was convicted by a jury of the offense of capital murder, namely murder in the course of kidnapping or burglary under Tex. Penal Code, § 19.03(a)(2). After the jury affirmatively answered the submitted special issues, the trial court sentenced appellant to death. Tex.Code.Crim.Proc.Ann. art. 37.071(b).[1] Appeal to this Court is automatic. Article 37.071(h). Appellant raises twenty-three points of error. We will affirm.

Appellant does not challenge the sufficiency of the evidence. However, a brief summary of the facts will be helpful in resolving the points of error.

Viewed in the light most favorable to the verdict, the evidence at trial showed: Appellant and his accomplice, Craig Ford,[2] were dating a mother and her daughter, respectively. Because of the similarity in their names, the women were referred to by age as Big Mary and Little Mary. They all resided in an apartment in Fort Worth.[3] At approximately 10:30 p.m. on September 1, 1990, Ford was present at the apartment and

---

1. Unless otherwise indicated, all references to articles are to those in the Texas Code of Criminal Procedure.

2. Ford had also been indicted for the capital murder of the victim and was, therefore, an accomplice as a matter of law.

3. There is some dispute about whether Ford still resided at the apartment on a regular basis.

testified that he was awaiting transportation to his mother's house. Appellant arrived and informed Ford he had a ride and invited Ford to go with him.

Ford followed appellant to the parking lot, and they both got into a dark-blue panel van. The van contained two seats, the driver and passenger seat, and a mattress on the floor of the rear of the van. Ford sat in the rear and appellant sat in the passenger seat. The driver's seat was occupied by the victim. Once inside the van, appellant introduced Ford to the victim.

On what Ford believed was the way to his mother's house, appellant asked the victim to pull over so he could relieve himself. The victim acquiesced, and appellant got out of the van. When he reentered the van, appellant pulled out a pistol, pointed it at the victim, and told him to shut up or he would kill him. Appellant grabbed the victim, threw him onto the mattress, and handcuffed the victim's hands behind his back as he pleaded for his life. Appellant then pushed Ford towards the driver's seat and told him to drive. At some point, the victim was also gagged and tied with a rope.

Ford was instructed to find a dark street, so he drove for several miles. Eventually, Ford turned down Wilbarger Street in Fort Worth. As he turned the corner, he heard a single shot in the back of the van. Ford pulled over in a secluded wooded area. Appellant exited on the passenger side, then went around and opened the rear doors of the van. Ford unsuccessfully attempted to assist appellant in removing the body from the van. As appellant dragged the body into the wooded area, Ford decided to flee down Wilbarger Street.

After disposing of the body, appellant returned to the van and went after Ford. When he caught up with Ford, appellant again drew his gun and ordered Ford to return to the van and drive. Ford agreed. The two returned to their girlfriends' apartment. On the way, appellant discarded the handcuffs he had removed from the body in an abandoned field. Ford threw the keys

into another field. The handcuffs were later recovered.

Angela Johnson, another of Big Mary's daughters, testified that she was at the apartment when appellant and Ford left and later returned. Upon their return, Johnson testified that appellant had blood on his pants and the lower part of his shirt. Ford told Johnson that they had been in a fight with some guys. There was no visible blood on Ford's clothes. As the evening progressed, Ford went in and out of Big Mary's room to apparently converse with appellant. Further, both appellant and Ford paced around the home looking out the windows, both stepped out of the apartment for a moment but returned shortly, and they conversed in secretive tones throughout the night.

Later that evening or early morning, Johnson and her mother left the apartment for some cigarettes. At appellant's request, they discarded a clear plastic grocery bag which contained appellant's blood-stained clothes[4] in a drainage ditch. The bag was later recovered by police. Further, Matthew Owens, a neighbor, testified that appellant asked him to burn a van parked nearby and told Owens not to worry about what he saw inside. Owens declined. However, a partially burnt rag was found next to the van when it was located by the police. Several days later when Johnson heard the news reports of the victim's death she called the police and informed them of appellant's actions.

On September 4, 1990, the victim's body was found gagged and face down in a field in the 6000 block of Wilbarger. Dr. Nizzam Peerwani, Tarrant County Chief Medical Examiner, testified that the victim died from a single .25–caliber gunshot wound to the head. The body had also sustained other injuries. Peerwani noted that there was a ligature impression encircling the victim's neck and an indentation in the facial tissue from the gag.

In his first point of error, appellant contends that the trial court erred in submitting an instruction on the law of parties in the

---

4. Aliece Watts, a forensic serologist, testified that the shirt and pants tested "positive presumptive" for blood and "positive" for human protein.

guilt/innocence charge because there was no evidence to support it. Alternatively, in his second point of error, he argues that even if a parties charge was appropriate, the trial court erred by failing to limit it to the facts of the case. And, in his third point of error, he complains that the trial court erroneously overruled his motion for new trial on the basis of the improper charge.

■■■ "A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." Tex. Penal Code, § 7.01(a). Therefore, under the law of parties, the State is able to enlarge a defendant's criminal responsibility to acts in which he may not be the principal actor. *Romo v. State* 568 S.W.2d 298, 300 (Tex.Crim.App. 1977) (opinion on rehearing). Because our penal code generally criminalizes conduct of individuals, the State is required to properly instruct the jury if it proceeds upon a parties theory.[5] Where there is no charge on the law of parties a defendant may only be convicted on the basis of his own conduct. *See Walker v. State*, 823 S.W.2d 247, 248 (Tex. Crim.App.1991), *cert. denied*, 503 U.S. 939, 112 S.Ct. 1481, 117 L.Ed.2d 624 (1992) (absence of law of parties in application paragraph permits jury to convict defendant only on his individual conduct).

In the instant case, the jury was charged in accordance with sections 7.01 and 7.02(a)(2) of the Texas Penal Code as follows:

Our law provides that a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

Each party to an offense may be charged with the commission of the offense. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, or encourages, or directs, aids or attempts to aid the other person to commit

the offense. Mere presence alone will not constitute one a party to an offense.

\* \* \* \* \* \*

Now, if you find from the evidence beyond a reasonable doubt that [the Defendant] . . . . did then and there intentionally cause the death of [the victim], by shooting him with a deadly weapon, to-wit: a firearm, and [the Defendant] was then and there in the course of committing or attempting to commit the offense of kidnapping of [the victim,] . . . . or by acting with the intent to promote or assist the commission of the offense, he solicited, encouraged, directed, aided or attempted to aid Craig Edwin Ford to commit the offense; or

[same paragraph except relating to the accompanying-offense of robbery], then you will find the Defendant guilty of the offense of capital murder.

■■■ The test for determining when an instruction should be submitted to the jury on the law of parties was set forth in *McCuin v. State*, 505 S.W.2d 827 (Tex.Crim.App. 1974):

Where the evidence introduced upon the trial of the cause shows the active participation in the offense by two or more persons, the trial court should first remove from consideration the acts and conduct of the non-defendant actor. Then, if the evidence of the conduct of the defendant then on trial would be sufficient in and of itself, to sustain the conviction, no submission of the law of [parties] is required . . .

On the other hand, *if the evidence introduced upon the trial of the cause shows, or raises an issue, that the conduct of the defendant then upon trial is not sufficient, in and of itself, to sustain a conviction, the State's case rests upon the law of [parties] and is dependent, at least in part, upon the conduct of another.* In such a case, the law of parties must be submitted and made applicable to the facts of the case.

---

**5.** A trial court may charge on law of parties where there is no such allegation in the indictment. *Crank v. State*, 761 S.W.2d 328, 352 (Tex. Crim.App.1988), ·*cert. denied*. 493 U.S. 874, 110

S.Ct. 209, 107 L.Ed.2d 162 (1989); *English v. State*, 592 S.W.2d 949, 955 (Tex.Crim.App.), *cert. denied*, 449 U.S. 891, 101 S.Ct. 254, 66 L.Ed.2d 120 (1980).

*Id.* at 830 (emphasis added); *see also Brown v. State,* 716 S.W.2d 939, 944 (Tex.Crim.App. 1986) (*McCuin* test still viable means for determining when cause should be submitted to jury on law of parties). To determine whether appellant was a party to Ford's actions, the trial court may look to events before, during, and after the commission of the crime. *Tarpley v. State,* 565 S.W.2d 525, 529 (Tex.Crim.App.1978).

■ Although we note that "defendant as the principal actor" is the theory best supported by the evidence, we conclude that there was evidence to support the inference that appellant acted as a party to the offense. Throughout the guilt/innocence phase, appellant attempted to put forth evidence that Ford had possibly committed or at least masterminded the crime. Appellant elicited that Ford was the one familiar with the areas involved—where the body was left, where the van was abandoned, and where the handcuffs and keys were thrown. Ford had friends or family living or working in each of those areas. Further, Ford testified that he attempted to help appellant remove the body from the van even though he was unsuccessful in his efforts. The record also shows that Ford later helped conceal the crime by telling Angela Johnson that he and appellant had been in a fight. He additionally conferred in hushed tones with appellant and maintained a vigil at the apartment windows throughout the night. Finally, there was evidence that the gun may actually have belonged to Ford. The trial court did not err in giving a parties instruction. *McCuin,* 505 S.W.2d at 830.

Next, appellant specifically complains that the trial court erred in failing to limit the parties charge to the "directs" mode of conduct. Appellant objected at trial that even if the parties charge was appropriate, it was overbroad. He argued that the evidence only supported that appellant "directed" Ford. Therefore, appellant requested that the trial court limit the parties instruction. Appellant preserved his complaint for appeal. *See Chatman v. State,* 846 S.W.2d 329, 332 (Tex.Crim.App.1993); *Johnson v. State,* 739 S.W.2d 299, 305 n. 4 (Tex.Crim.App.1987).

■ Appellant concedes that there was evidence that appellant directed Ford. After a careful review of the record, we further conclude that there was evidence from which the jury could infer that appellant solicited, encouraged, or aided Ford. First, appellant asked Ford if he would like to ride with him in the van. The jury was free to disregard Ford's testimony that he simply wanted a ride to his mother's, especially because no one else heard Ford make the statement. The jury could further infer that appellant encouraged Ford to drive the van. No one other than Ford states that he was directed at gunpoint. Appellant also encouraged Ford to help move the body and throw away the van keys. If the jury believed the defense theory that Ford planned the crime, it is obvious that appellant aided him in the endeavor.

The trial court did not err in failing to limit the parties instruction. **Points of error one and two are overruled.** Because we have held that the charge was proper, the trial court did not err in overruling appellant's motion for new trial on the basis of an erroneous parties charge. **Point of error three is also overruled.**

■ In points of error four through six, appellant complains the trial court erred in preventing him from asking proper questions of veniremembers Brewer and Northcutt, thereby preventing the intelligent use of his peremptory strikes. A defendant's constitutional right to counsel includes the right to question members of the jury panel in order to intelligently exercise peremptory challenges. Tex. Const. art. 1, § 10; *Powell v. State,* 631 S.W.2d 169, 170 (Tex.Crim.App. 1982). A question is proper if it seeks to discover a juror's views on an issue applicable to a case. *Nunfio v. State,* 808 S.W.2d 482, 484 (Tex.Crim.App.1991).

■ The denial of a proper question during voir dire is always reversible error and will not be subject to a harm analysis under Rule 81(b)(2) of the Texas Rules of Appellate Procedure. *Nunfio,* 808 S.W.2d at 485. However, the trial court does have the authority to impose reasonable restrictions on the exercise of voir dire examination. *Guerra v. State,* 771 S.W.2d 453, 467 (Tex.

Crim.App.1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1989). The standard of review in cases such as this is whether the trial court abused its discretion in preventing counsel from asking a proper question. *Nunfio,* 808 S.W.2d at 484; *see also Woolridge v. State,* 827 S.W.2d 900, 904 (Tex.Crim.App.1992).

■ Evidence which tends to mitigate against a defendant receiving the death penalty is a proper area for inquiry by defense counsel. *See* article 37.071 § 2(a).[6] However, we have held that it is improper for counsel to attempt to bind or commit a prospective juror to a verdict based on a hypothetical set of facts. *Allridge v. State,* 850 S.W.2d 471, 480 (Tex.Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

We note that appellant's complaint regarding venireperson Brewer is without merit. Appellant was not called upon to decide whether to exercise a peremptory strike because the trial court granted appellant's challenge for cause against this venireperson. *See Jones v. State,* 843 S.W.2d 487, 496 (Tex. Crim.App.1992), *cert. denied,* 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). **Point of error four is overruled.**

■ With regards to Northcutt, appellant's inquiries were limited to asking the prospective juror if he could give fair consideration to specific evidence of an abused or troubled childhood. Northcutt stated that he would take that into consideration. Appellant then inquired as follows:

> [Defense Counsel]: Do you envision whether evidence of that type could ever rise to the level that could cause you to feel that the death penalty would not be appropriate?
>
> [State]: Your Honor, I'm going to object as that question calls for him to assess some weight to that and that is improper.
>
> [Objection sustained]

[Defense Counsel]: Speaking of this mitigation, is there anything in that category of evidence that would rise to the level of having a moral—a reasoned moral response to the death penalty that would have you say no, the death penalty isn't appropriate?

> [State]: Your Honor, again, I'm going to object. Again, he's attempting to bind him to a list of categories that have been given to him.
>
> [Objection sustained]

Appellant's point is without merit. Assuming *arguendo* we were to agree that the trial court improperly sustained the State's objection, appellant was allowed to question Northcutt further as follows:

> Q. With the evidence I've just spoken of [religious conversion], would you be able to take that into consideration, give fair consideration to that as far as helping you to determine whether or not you should change your answers after they had been answered yes?
>
> * * * * * *
>
> Q. And again, the age of the offender, is that something that you could take into fair consideration in determining whether or not the answers to these special issues should be answered no?
>
> * * * * * *
>
> Q. Okay. If the person had some history of intoxication, drug abuse, something such as that, is that something that you could give fair consideration in helping you decide what those answers should be, whether they should be yes or no, or whether they should be changed from yes to no?
>
> * * * * * *
>
> Q. Evidence of some type of mental illness or mental retardation—of course, there is all ranges of that sort of stuff—but is that something you can give fair consideration in determining what the answers

---

**6.** Article 37.071 § 2(a) states: "In the proceeding, evidence may be presented by the State and the defendant or the defendant's counsel as to any matters the court deems relevant, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty." *But compare Robertson v. State,* 871 S.W.2d 701, 712 n. 13 (Tex.Crim.App.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994) (law does not require a juror to believe youth is mitigating).

should be or whether you should change your answers?

\* \* \* \* \* \*

Q. And, in fact, giving consideration to any or all or whatever you consider as mitigation evidence, even if it's more than what these categories might be and certainly could be, is that something that you could give such consideration to that could result in the change of a yes to a no?

Northcutt answered affirmatively to each of these questions. In light of the allowed follow-up question, the sustaining of the State's objection did not improperly restrict appellant's questioning as discussed in *Wheatfall v. State,* 882 S.W.2d 829, 843–44 (Tex.Crim. App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995) (Baird, J., concurring). **Points of error five and six are overruled.**

In point of error seven, appellant complains the trial court erred in sustaining the State's challenge for cause to veniremember Ridgway because she was unable to return an affirmative answer to the future dangerousness issue based on the facts of the offense alone. *See Garrett v. State,* 851 S.W.2d 853, 859–60 (Tex.Crim.App.1993). Because appellant failed to object to the trial court's ruling, however, appellant has failed to preserve error. *Black v. State,* 816 S.W.2d 350, 367 (Tex.Crim.App.1991).

■ Appellant contends on appeal that his failure to object should not waive error because he was unable to anticipate the change in the law that occurred in *Garrett, supra.* Therefore, he argues this Court should adopt the "right not recognized doctrine" as an exception to that rule. *See Black,* 816 S.W.2d at 367; *Ex parte Chambers,* 688 S.W.2d 483, 486 (Tex.Crim.App. 1984), *cert. denied,* 474 U.S. 864, 106 S.Ct. 181, 88 L.Ed.2d 150 (1985). One of the purposes of objecting at trial is to preserve trial error for changes in the law. *See Garrett, supra.* Additionally, the rationale for appellant's strategic choices are endless. We cannot conclude that the only reason appellant failed to object to the State's challenge was the as-yet-unestablished defect found in *Garrett. See Crawford v. State,* 617 S.W.2d 925,

940 (Tex.Crim.App.1980), *cert. denied,* 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981) (op. on rehearing). **Appellant's seventh point of error is overruled.**

In appellant's eighth, ninth, and tenth points of error, he complains the State impermissibly commented on the appellant's failure to testify in violation of the article 38.08, article 1, section 10 of the Texas Constitution, and the Fifth Amendment of the U.S Constitution. During final argument in the punishment stage of the trial, the State made the following comments:

PROSECUTOR: But you know the most devastating testimony, maybe the most devastating next to Ms. Tucker's testimony was when Dr. Finn gets up here and tells you that there is no brain defect, there is no disorder on which to place the blame for the bloody, vile crime that [appellant] has committed again and again, that his mind works just like ours, that he knows how to think, he knows how to act on those thoughts, he is aware of his consequences.

Weren't you hoping to hear something to explain this, something to tell you, well, there is something wrong with him, he's sick somehow? That is why he can do these crimes. And we can't even explain why he commits, but there wasn't any. There is nothing wrong, but he was abused. He was an abused child. You don't get the evidence directly. This time its filtered through the—

DEFENSE COUNSEL: Objection, Your Honor.

THE COURT: Just—

DEFENSE COUNSEL: Objection, Your Honor. That is an impermissible comment on the Defendant's failure to testify, and I object.

THE COURT: Overruled.

PROSECUTOR: Don't get those directly. They are filtered through the Defendant's witnesses. You could tell through the cross when asked was there any direct statements in there about this happening to David or that happening to David, no.

■ There are four permissible areas of jury argument: summation of the evi-

548

dence, reasonable deductions from the evidence, an answer to an argument by opposing counsel, or a plea for law enforcement. *Hughes v. State,* 878 S.W.2d. 142, 157–158 (Tex.Crim.App.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 2184, 128 L.Ed.2d 902 (1994) (op. on rehearing); *Moody v. State,* 827 S.W.2d 875, 894 (Tex.Crim.App.), *cert. denied,* 506 U.S. 839, 113 S.Ct. 119, 121 L.Ed.2d 75 (1992). When addressing a complaint of improper comments on a defendant's failure to testify, we review the language from the standpoint of the jury. *Staley v. State,* 887 S.W.2d 885, 895 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995); *Swallow v. State,* 829 S.W.2d 223, 225 (Tex.Crim.App.1992). The fact that the language might be construed as an implied or indirect allusion to a defendant's failure to testify is not sufficient. *Staley,* 887 S.W.2d at 895. Where the statement does not refer to evidence which can only come from the defendant, then it is not a direct comment on a defendant's failure to testify. *Staley,* 887 S.W.2d at 895; *Swallow,* 829 S.W.2d at 225.

Appellant contends that the State's comment directly referred to appellant's failure to testify when the prosecutor argued: "He was an abused child. You don't get the evidence directly.... They are filtered through the [appellant's] witnesses." He argues that the only logical interpretation of this comment is that the jury did not hear it from the defendant himself. We disagree.

▪ After a review of the evidence at punishment, we conclude that the prosecutor's argument was merely a summation of the evidence. Dr. Raymond Finn, a psychologist called by the defense, testified that reports filed during appellant's childhood with the Department of Human Services did not refer to any direct abuse to appellant, but instead centered on the sexual abuse of his sister.[7] Further, Finn testified without objection that when he interviewed appellant, appellant denied that he was abused. The statement "you don't get the evidence directly" is reasonably interpreted as relating to the fact that no official reports confirmed the testimony of abuse elicited from appellant's grandmother and sister. When viewed in its entirety, especially considering the fact that appellant's statement about the abuse was in evidence, we do not believe the trial court abused its discretion in overruling appellant's objection to the State's argument. **Points of error eight, nine, and ten are overruled.**

In his eleventh point of error, appellant asserts the trial court erred in allowing the State to misstate the law to veniremember Kammerdiener. Specifically, appellant complains that the State improperly implied that a juror does not have to see a difference between "deliberately" and "intentional" when the prosecutor stated:

Okay, and that's all that's required. It's not necessary that you give us a definition of deliberately. The law doesn't even require that a person say, yeah, I can see a distinct difference, as long as they can say without any doubt that they're going to base their answer to this issue on all the evidence. They're going to consider the evidence—

Appellant objected on the grounds that this was a misstatement of the law. The trial court overruled the objection. We agree with the trial court.

▪ We first note that the State does not say that the law does not require Kammerdiener to find *any* difference between "intentional" and "deliberate," but states that the law does not require that she find a *distinct* difference. This is not a misstatement of the law. The law only requires that venirepersons find *a* difference between the two terms and be able to base their answers on the evidence presented. *See Satterwhite v. State,* 858 S.W.2d 412, 415–17 (Tex.Crim. App.), *cert. denied,* 510 U.S. 970, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993); *Guerra,* 771 S.W.2d at 471–72. Further, the record reveals that the State on numerous occasions explained at length the difference between the two terms. Also, Kammerdiener states repeatedly throughout her voir dire, both before and after the allegedly-improper

---

7. Apparently only one report discussed injuries to appellant. That report only referenced some unexplained bruising.

statement, that she does find a difference between the two terms, will not answer the special issues automatically, and will base her answers on the evidence presented. Therefore, even if we were to find the remark to be improper, appellant can not show he was harmed. **Appellant's eleventh point of error is overruled.**

In his twelfth point of error, appellant contends that the trial court erred when it heard and granted the State's application for a grant of immunity for Ford without notice to or the presence of defense counsel or appellant.[8] Appellant asserts that a defendant's presence is an absolute requirement in "all phases of proceedings against him" under the confrontation clauses of both the federal and state constitutions and article 33.03.[9] *See Miller v. State*, 692 S.W.2d 88, 90–91 (Tex.Crim.App.1985). Appellant maintains that had he been notified he would have presented evidence opposing the transactional grant of immunity for Ford.[10]

 We have no doubt that appellant would have discouraged the grant of immunity to Ford in this case, as would any defendant in appellant's situation. Ford, as the accomplice and only witness to the actual crime, provided the most incriminating evidence against appellant. However, we are unable to agree that the immunity hearing between Ford and the State was a hearing in appellant's case. Further, the immunity agreement was between Ford and the State and did not involve appellant's rights. Therefore, we conclude the immunity hearing was not "a proceeding against him" in which

he had a right to be present. From all indications the filing of the agreement in appellant's case only indicates that the State chose to put appellant on notice of Ford's transactional and use immunity agreement and that Ford's testimony would be used against him in his case. *See* footnote 10, *supra.* Further, appellant fails to demonstrate harm. He had the right to confront Ford at trial as to the immunity agreement and its conditions. *Shelby v. Texas*, 819 S.W.2d 544, 546–51 (Tex.Crim.App.1991). Where the presence of the defendant does not bear "a reasonably substantial relationship to the opportunity to defend," no harm is shown by his absence. Tex.R.App.Proc. 81(b)(2); *Adanandus v. State*, 866 S.W.2d 210, 219 (Tex.Crim.App.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994). **Appellant's twelfth point of error is overruled.**

In appellant's thirteenth point of error, he argues the trial court erred in limiting his discussion of the reasonable doubt standard during the voir dire of prospective juror Klein.[11] The following exchange occurred:

[Defense Counsel]: ... I don't even remember exactly what I was getting ready to say, but the bottom line is, is that it's not improper for you to have strong feelings against the death penalty. It's not improper that those feelings may make you, for instance, view the evidence by a standard of beyond a reasonable doubt, because we don't know what beyond a reasonable doubt is to you.

Klein: Uh-huh.

---

**8.** The State filed Ford's application for transactional and use immunity in appellant's case. The application itself is styled "The State of Texas v. David Lee Goff." However, the application deals solely with Ford's rights and his immunity agreement. We have been presented with no evidence regarding whether the application and agreement were filed in Ford's case also.

**9.** Appellant's mention of article 33.03 is inappropriate as that provision applies only to proceedings at *trial*. A defendant's appearance at proceedings before trial is governed by article 28.01 § 1. However, that provision may also be inapplicable in the instant case because the immunity hearing between Ford and the State is not within the list of pre-trial hearings provided in the statute.

**10.** We note that appellant is precluded from preventing a witness from testifying at trial. Rule 501 of the Rules of Criminal Evidence states: "Except as otherwise provided by these rules or by Constitution, statute, or court rule prescribed pursuant to statutory authority, no person has a privilege to ... (3) Prevent another from being a witness or disclosing any matter or producing any object or writing."

**11.** The voir dire in this case occurred before our holding in *Geesa v. State*, 820 S.W.2d 154 (Tex. Crim.App.1991). However, the trial occurred after our holding in *Geesa* and the jury was subsequently charged with a definition of "reasonable doubt."

[Defense Counsel]: There is plenty of—plenty of support for the proposition that, indeed, in a case in which the State of Texas has asked for the death penalty, is seeking the death penalty, that the evidence is to be weighed with the utmost certainty and clarity as a juror—

The State objected to the implication that a different standard of proof was required in a capital case.

Appellant complains that by sustaining the objection the trial court improperly limited his discussion of the reasonable doubt standard. A trial court abuses its discretion if it refuses to allow the defendant to voir dire venirepersons about what they think reasonable doubt means. *Lane v. State,* 828 S.W.2d 764, 766 (Tex.Crim.App.1992). However, this is not the case here.

We first note that appellant was not asking a question, but instead making a statement about the law. We conclude that this statement was improper. The standard for all criminal cases is "beyond a reasonable doubt." Tex. Penal Code Ann. § 2.01. Individual jurors may require different levels of proof in order to be convinced beyond a reasonable doubt, but counsel may not *suggest* to the venire that they *should require* more proof in some cases over others merely due to the seriousness of the charges or the possible punishment. *See Jones v. State,* 850 S.W.2d 223, 226 (Tex.App.—Fort Worth 1993, pet. ref'd). The court stated in *Jones:*

> An attempt to *question* a potential juror about whether he would require a higher threshold of proof and an attempt to *suggest* that he may require a higher threshold of proof are two different things altogether. While questioning is proper, the suggesting is not.

*Id.*

Appellant was not prevented from questioning Klein about his understanding of "reasonable doubt." The trial court merely refused to allow defense counsel to suggest to Klein that he could require a different quantum of proof depending on the nature of the case. *Id.* at 227. Because the trial court did not abuse its discretion, **appellant's thirteenth point of error is overruled.**

In appellant's fourteenth point of error, he argues that the trial court erred in ordering a veniremember to appear at a date later than previously scheduled because his original appearance date conflicted with his non-refundable vacation plans. Appellant contends this was a *sua sponte* one-person "jury shuffle" under article 35.11. We disagree. We believe article 35.20, and not 35.11, governs this situation.

Article 35.20 provides that:

> In selecting the jury from the persons summoned, the names of such persons shall be called in the order in which they appear upon the list furnished the defendant. Each juror shall be tried and passed upon separately. A person who has been summoned, but who is not present, may, upon his appearance before the jury is completed, be tried as to his qualifications and impaneled as a juror, unless challenged, but no cause shall be unreasonably delayed on account of such absence.

*See also* article 35.01. Had this veniremember been spontaneously absent, appellant agrees that the trial court would have been permitted to skip over the tardy individual and begin voir dire examination of him at a later time. However, appellant contends this statute is not applicable because the veniremember was not absent but rather was directed by the trial court to appear at a later time. Because of this distinction, he argues that the move of the juror from the number two slot to the number eighteen slot constituted an impermissible jury shuffle.

After the order of voir dire was determined, the trial court was informed by veniremember Leach (number two on the list) that he would be unable to attend individual voir dire on the day assigned. Leach stated he had non-refundable vacation plans—plans he failed to inform the court of during the court's general examination of the venire. Initially, the trial court ordered Leach to appear as scheduled. However, the trial court eventually relented and ordered Leach to appear on a specified date upon his return.

Article 35.20 would have permitted Leach to have been empaneled, unless chal-

lenged, had he missed his appearance date and appeared when he returned. *See also Ferguson v. State,* 573 S.W.2d 516, 519 (Tex. Crim.App.1978), *cert. denied,* 442 U.S. 934, 99 S.Ct. 2870, 61 L.Ed.2d 304 (1979). Both articles 35.20 and 35.01 provide a means to permit our citizens to serve as jurors if they are absent and later make an appearance before the trial court. The only qualification is that the cause not be "unreasonably delayed on account of such absence." We believe that in limited circumstances, like the instant case, a trial court does not abuse its discretion in informing a juror who notifies the court of his impending absence to appear on the next available date for jury service.[12] **Appellant's fourteenth point of error is overruled.**

In points of error fifteen, sixteen, and seventeen appellant complains the trial court erred in submitting a nullification instruction in the punishment charge. His complaint on appeal is not concerned with the substance of the instruction given, but rather he alleges in those points that the sentence is invalid because the instruction: (1) is contradictory, (2) requires the jury to violate their oaths, and (3) is arbitrary.

At trial, appellant objected to the definition of "mitigating evidence." Appellant also requested a special instruction which asked the potential jurors to nullify their answers to the special issues if they believed the defendant should receive a life sentence. The State argues on appeal that appellant has failed to preserve error. We agree. Appellant's trial objections in no way specifically alerted the trial judge to the alleged error of which he now complains.

Where his trial objections do not comport with his arguments on appeal, appellant has failed to preserve error on those issues. Tex.R.App.Proc. 52(a); *Satterwhite v. State,* 858 S.W.2d 412, 430 (Tex.Crim.App.), *cert. denied,* 510 U.S. 970, 114 S.Ct. 455, 126 L.Ed.2d 387 (1993). We further perceive no difference between the instructions appellant requested and the trial court's actual instruction. *See Penry v. State,* 903 S.W.2d 715, 764 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995). **Appellant's fifteenth, sixteenth, and seventeenth points of error are overruled.[13]**

In his eighteenth point of error, appellant complains the trial court erred in denying his request to define the term "probability."[14] Appellant acknowledges that this Court has consistently declined to require such a definition; nevertheless, he contends we should revisit those opinions. His request is premised upon the belief that "probability" could mean "any chance." However, we recently rejected a similar proposition as not consistent with everyday terminology. *See Robison v. State,* 888 S.W.2d 473, 481 (Tex.Crim. App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995) (appellant asserted probability could mean 1 in 100). Additionally, we are not inclined to revisit our consistent holdings that the term need not be defined. *See Hughes,* 878 S.W.2d at 147–148 (op. on original submission); *Cantu v. State,* 842 S.W.2d 667, 691 (Tex.Crim.App. 1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993), and cases cited therein. **Appellant's eighteenth point of error is overruled.**

12. Unlike article 35.11, error under article 35.20 is subject to a harm analysis. *See Hovila v. State,* 562 S.W.2d 243 (Tex.Crim.App.1978), *cert. denied,* 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979) (error may be waived). Even if we hold that appellant properly objected to Leach's postponement, he cannot show harm. Appellant did not use all of his peremptory strikes, therefore, he cannot show that the use of a strike against Leach was detrimental to him in any way.

13. The trial court included the "nullification instruction" to meet the constitutional requirements set forth in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

This type of instruction has been approved by this Court. *Robertson,* 871 S.W.2d at 710; *Fuller v. State,* 829 S.W.2d 191, 209 n. 5 (Tex.Crim.App. 1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993). Therefore, appellant can show no egregious error or harm under *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim.App.1984).

14. During the punishment phase of the trial, the jury must answer a special issue which posits, "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Article 37.071 § 2(b)(1) (formerly, 37.071(b)(2)).

In his nineteenth point of error, appellant complains that the trial court erred in overruling his *Batson* motion challenging the State's peremptory strikes based on the veniremembers' active participation in their respective religions. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We have recently held that the holding in *Batson* condemning peremptory challenges based on race does not extend to the exclusion of venirepersons based on belief. *Casarez v. State*, 913 S.W.2d 468 (Tex.Crim.App.1995) (op. on rehearing). We similarly held that the holding of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), which extends *Batson* to the issue of gender, also does not apply. *Id.* Appellant raises no novel arguments to persuade us to revisit this holding. **Point of error nineteen is overruled.**

In appellant's twentieth point of error, he alleges that the trial court erred in refusing to allow him to rebut the State's good character evidence about the deceased with the deceased's prior felony convictions.[15] At trial, appellant specifically complained that he wanted to rebut the victim's good-work ethics and rebut the fact that the victim had dealt with his drug problem. Appellant further suggested that there might be some relationship between the victim's past drug problem and the fact that Ford had been arrested on a drug charge sometime after the instant offense.

Appellant points to the following State's evidence of the deceased's "good character:"

Q: [By the State] Under what circumstances did you first come in contact with [the victim]?

A: [The victim] had sought treatment for alcoholism, drug abuse, in a program at the state hospital in Rusk. We have a close friend who was the program director at that time. He worked with [the victim] in a counseling role at Rusk. *He knew that we were looking for appropriate peo-*

*ple for an intern program.* He called and talked to us about [the victim].

\* \* \* \* \* \*

[The victim] entered Star House 8/16/88. He entered the intern program February the 1st of '89.

Q: Now, starting with the August 16th, '88, date. He entered as a patient; is that right?

A: That's correct.

Q: And when did he complete his status as a patient there?

A: Usually we consider them a patient status for the first 60 to 90 days, depending on the individual's program progress. [The victim] had already been in treatment at the state hospital.

Q: I guess my question is going to before he became an intern, was he still a patient or had he done anything—had he been able to solve his addiction problems before becoming an intern?

A: My feeling is that [the victim] had dealt with his addiction problem. He had an interest in the intern program. We didn't admit him to the intern program immediately. He got—we proposed to him that he go on job search [sic] to have that experience. He did. He got a job. He was actively employed. *His reviews from his job were real well, real good. He did a good job out there. And as he became more stable, he came into the intern program February 1st of '89.*

[Emphasis added.] Appellant asserts that through the emphasized portions set out above "the State created the impression with the jury that the deceased was an appropriate, stable, good person." He further argues that when the State injected the "good" character of the victim he should have been permitted to cross-examine the witness concerning "relevant specific instances of conduct." *See* Tex.R.Crim.Evid. 405(a). In the instant case, we conclude that the trial court did not abuse its discretion in denying appellant the opportunity to cross-examine the witness concerning the victim's past convictions.

---

15. On appeal appellant complains specifically of the victim's former convictions for injury to a child and forgery.

■ Evidence is "relevant" that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R.Crim.Evid. 401; *Montgomery v. State,* 810 S.W.2d 372, 386 (Tex.Crim.App.1990) (op. on rehearing). Questions of relevance should be left largely to the trial court, relying on its own observations and experience, and will not be reversed absent an abuse of discretion. *Id.* at 391; *Moreno v. State,* 858 S.W.2d 453, 463 (Tex.Crim.App.), *cert. denied,* 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993).

At trial, the judge stated that he was at a loss to see the connection between the fact that a person is a good worker and the fact that he had once been convicted of injury to a child. We agree. Further, there had been no evidence presented at this time that drugs had anything to do with the instant offense. Appellant showed no relevance, and still does not, between the victim's prior convictions, his work ethic, his drug use, and the instant crime.

■ Further, we conclude that the witness, Robert McDonough, was not a character witness. The evidence elicited from McDonough involved the victim's employment at the Star House drug treatment facility and was relevant to verify the victim's identity and to illustrate why the victim was driving the Star House van the night of the murder. The testimony that he may have been a good employee is incidental. The trial court did not abuse his discretion.[16] **Appellant's twentieth point of error is overruled.**

In his twenty-first point of error, appellant argues that the trial court erred in admitting a portion of his pen packet during punishment. Specifically, appellant asserts two convictions within the packet are void. The two convictions were for attempted capital murder committed when appellant was fifteen-years old. In both cases, appellant was certified as an adult, pled guilty, and received fifteen-year sentences to be served concur-

rently. Appellant argues in each case that the required waiver of the examining trial was not made pursuant to the proper statute. *See* Former Tex. Family Code Ann. § 54.02(h) (Vernon's 1986) ("The examining trial shall be conducted by the court to which the case was transferred, which may remand the child to the jurisdiction of the juvenile court."); Tex. Family Code Ann. § 51.09(a) (Waiver of juvenile rights).

■ We need not address the propriety of the waivers in this case. Assuming, *arguendo,* the waivers were improper, appellant was not harmed. Tex.R.App.Proc. 81(b)(2). The State introduced evidence by the victims in each of the two attempted capital murders. Each victim described how they were shot when three youths attempted to steal their automobiles. Additionally, the State introduced appellant's confessions to each of the attempted capital murders wherein appellant corroborated the account of each victim and confessed to shooting both individuals. Accordingly, admission of the allegedly-void judgments was harmless beyond a reasonable doubt in this instance. Tex.R.App.Proc. 81(b)(2); *Hughes,* 878 S.W.2d at 156–157 (evidence of judgment of aggravated assault case reversed by appellate court harmless where extensive evidence of aggravated assault was admitted at trial). **Appellant's twenty-first point of error is overruled.**

In the twenty-second point of error, appellant argues he was deprived of his right to present a defense under the Sixth Amendment of the U.S. Constitution. Appellant attempted during the guilt phase of the trial to introduce evidence of the victim's homosexuality. He asserts this is part of his fundamental right to present a defense. *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The State argues that the evidence of the victim's homosexuality was not relevant to the determination of appellant's guilt or innocence. Appellant posits that such an argument cannot stand scrutiny because this Court has previ-

---

**16.** We also note that the jury was informed through appellant's cross of McDonough that the victim was a drug addict and had only been free of drugs for a two-year period. Therefore, the

information appellant stressed that he needed to show the jury was elicited without the use of the prior convictions.

ously considered a capital murder case in which the homosexuality of the deceased played a significant factor in the accused's defense. *See Nelson v. State,* 848 S.W.2d 126 (Tex.Crim.App.1992), *cert. denied,* 510 U.S. 830, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993) (plurality opinion). We hold that *Nelson* is not applicable.

■■■ In *Nelson,* the victim's homosexuality was relevant to Nelson's defense. Nelson claimed that he killed the victim because the victim looked at him in a lustful way. In the instant case, appellant has failed to show any connection between the victim's homosexuality and the crime. Further, there is no evidence that appellant was even aware prior to trial that the victim had any homosexual tendencies.

Appellant argues that the "crucial references" to the victim's homosexuality provided him with "the beginnings of a defense strategy that the trial court refused to let the jury hear." However, we are not inclined to determine what that strategy may have been on appeal. Absent any argument demonstrating relevance, we are unable to address whether appellant was denied his right to present his defense.[17] *See* Tex.R.App.Proc. 52(b); Tex.R.Crim.Evid. 401. **Appellant's twenty-second point of error is overruled.**

Finally, in his twenty-third point of error, appellant complains that it was error not to admit the extensive evidence concerning the victim's homosexuality at punishment. He asserts that by precluding this information from the jury's consideration, the jury was deprived of the full range of evidence that may be considered in the decision as to whether the death penalty was the appropriate punishment under the Eighth Amendment of the U.S. Constitution.

At trial, appellant argued:

Your honor, the evidence of the deceased's character can certainly be utilized by a fact-finder as some evidence of mitigation in determining whether or not they are going to sentence a person to die or whether they'll sentence him to a life prison sentence.

Appellant's contention is premised on the assumption that the jury would consider a homosexual a less valuable member of society, therefore, because appellant killed a person of little value, he did not deserve the death penalty. On appeal, appellant further posits that *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), created two areas of *per se* relevant evidence: (1) evidence providing a glimpse of the life of the victim; and (2) evidence demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide. Appellant reads *Payne* too broadly.

■■■ In *Payne,* the defendant brutally and repeatedly stabbed a mother and her two children. One of the children, a three-year old boy, survived the attack. At punishment, the State called the boy's grandmother to testify as to how the child was affected by the murders of his mother and sister. The defendant challenged the admission of evidence concerning the good character of the victims and the emotional impact of the crime on the family. The Supreme Court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne,* 501 U.S. at 827, 111 S.Ct. at 2609, 115 L.Ed.2d at 736. Therefore, it is purely a function of state law whether that state chooses to admit victim impact evidence into capital murder prosecutions. *Payne* merely holds that if a state chooses to do so, it will not violate the Eighth Amendment. Admissibility of "victim impact" evidence, or in this case "reciprocal victim impact" evidence,[18] is

---

**17.** At trial, appellant argued that evidence of the victim's homosexuality might go to prove his inability to counsel patients at Star House and his own psychological standing. We decline, as did the trial court, to hold that homosexuality shows the inability to counsel or that someone has psychological problems. Regardless, we still fail to see the relevance of this evidence to the instant offense.

**18.** Victim impact evidence has generally been confined to evidence of the victim's good character and deeds and the effect of the victim's death on the victim's family. In the instant case, appellant wished to introduce evidence of what he considered to be the bad character of the victim.

still governed by Texas law. *See* article 37.071; Tex.R.Crim.Evid. 401 and 402.

This Court has held that a trial court has wide discretion in admitting or excluding evidence at the penalty phase of a capital murder trial. *Lane v. State,* 822 S.W.2d 35, 41 (Tex.Crim.App.1991). However, this discretion is limited. Article 37.071(a) states in part that either party may present evidence in the punishment phase "as to any matter that the court deems *relevant to sentence.*" [Emphasis added.] Furthermore, Texas Rule of Criminal Evidence 401 defines "relevant evidence" as:

> [E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

With these limits in mind, the parties then present evidence and the jurors are thereafter asked to answer two or three punishment issues. *See* article 37.071(b). Their answers to these questions then dictate to the trial court what sentence is to be imposed per statute.

The 37.071(b) issues focus purely on the defendant's own behavior:

> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

However, the jury was also provided with a nullification instruction to take into account any evidence that mitigated against the death penalty:

> During your deliberations and in answering the Special Issues presented to you, you shall consider any mitigating circumstances presented by either party that was admitted for your consideration in either phase of the trial. A mitigating circumstance may be any aspect of the Defendant's character or background or the circumstances of the offense for which you have found the Defendant guilty, which you believe makes a sentence of life more appropriate.
>
> If any juror finds that there is a mitigating circumstance, that juror must decide how much weight it deserves and give it the effect the juror believes to be appropriate when the juror answers the Special Issues. If any juror decides, in consideration of this evidence, that a sentence of life, rather than a death sentence, is more appropriate, that juror is instructed then to answer either Special Issue or both Special Issues "No."

Past this framework, no further guidance is given by our Legislature or by the Texas Rules of Criminal Evidence as to exactly what types of evidence are "relevant" under these issues.

 We first note that the evidence of the victim's homosexuality was not relevant to any of the special issues because, as stated in point of error twenty-two, appellant was not aware of the victim's homosexuality at the time of the offense nor was it related to the offense in any way. Therefore, we must determine if the evidence was relevant to the jury's individualized assessment of the appropriateness of the death penalty under *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In *Penry,* the Supreme Court held that article 37.071 was unconstitutional *as applied* because the statute failed to provide the jury with a vehicle to give effect to the mitigating evidence. *Penry,* 492 U.S. at 328, 109 S.Ct. at 2949, 106 L.Ed.2d at 284. The Court instructed that in instances where mitigating evidence was presented, all that is constitutionally required is a vehicle by which the jury is able to consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Id.; see also Johnson v. Texas,* 509 U.S. 350, 363, 113 S.Ct. 2658, 2667, 125 L.Ed.2d 290 (1993). In Texas, this vehicle commonly takes the form of a jury nullification instruction. *See Robertson v. State,* 871 S.W.2d 701, 710 (Tex.Crim.App.1993), *cert.*

denied, —— U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994); *Fuller v. State*, 829 S.W.2d 191, 209 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993).[19]

 In discussing the relevancy of mitigating evidence, we have held:

Mitigating circumstances relevant to punishment within the meaning of the Eighth Amendment are those circumstances of "the defendant's background and character [which will support a] belief, long held by this society, that defendants who commit criminal acts that are attributable to [such circumstances] may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (concurring opinion of O'Conner, J.).

*Robison v. State*, 888 S.W.2d 473, 487 (Tex. Crim.App.1994); *Lewis v. State*, 815 S.W.2d. 560, 567 (Tex.Crim.App.1991). We have previously required that evidence proffered by a defendant must tend to demonstrate that this defendant is less morally culpable for a crime than a similarly-situated defendant without this evidence. *Robison*, 888 S.W.2d at 487. In other words, in order for mitigating evidence to have relevance beyond the scope of the special issues, there must be relevance between the mitigating evidence and the circumstances surrounding the crime that tends to excuse or explain the criminal act, so as to make that particular defendant less death-worthy. *Satterwhite v. State*, 858 S.W.2d 412, 427 (Tex.Crim.App.1993); *Goss v. State*, 826 S.W.2d 162, 165 (Tex.Crim.App.1992) (plurality opinion).

 Applying the relevancy requirement to the instant case, it cannot be said that the evidence of the victim's homosexuality is relevant to *appellant's* background, character, or the circumstances of the crime. Therefore, the trial court did not err in excluding the evidence. *See also Alvarado v. State*,

912 S.W.2d 199, 217 (Tex.Crim.App.1995) (evidence of victim's prior bad act excluded because it does not lessen defendant's blameworthiness when defendant is unaware of the bad act). *Cf. Smith v.State*, 919 S.W.2d 96, 97–101 (Tex.Crim.App.1996) (admissibility of favorable victim impact); *Ford v. State*, 919 S.W.2d 107, 112–18 (Tex.Crim. App.1996) (admissibility of favorable victim impact). Furthermore, we do not believe that *Payne* contemplates the instant type of "reciprocal-victim impact" evidence. *Payne*, 501 U.S. at 825–27, 111 S.Ct. at 2608–09 (The Court specifically focused on the fairness of rebutting the good character evidence of the defendant with good character evidence of the victim). **Point of error twenty-three is overruled.**

We find no reversible error, therefore, judgment of the trial court is AFFIRMED.

McCORMICK, P.J., and CLINTON, MALONEY and KELLER, JJ., concur in the result.

BAIRD, Judge, concurring.

In his twenty-third point of error, appellant contends the trial judge erred in excluding evidence of the victim's homosexuality. Appellant argues the evidence was admissible to establish the victim, because of his homosexuality, was a less valuable member of society and, therefore, appellant was less deserving of the death penalty.[1]

**I.**

In *Smith v. State*, 919 S.W.2d 96 (Tex.Cr. App.1996) (plurality opinion), we held Tex. Code Crim.Proc.Ann. art. 37.071 does not permit the admission of victim impact evidence and such is inadmissible as a matter of law to the extent it is not directly related to the circumstances of the offense or necessary for rebuttal. *Id.*, 919 S.W.2d at 101. This holding was based, in part, on *State v. Car-*

---

19. In 1991, in order to comply with *Penry*, the Texas Legislature revised Article 37.071. The new statute is applicable to all offenses occurring on or after September 1, 1991. *See* Tex.S.B. 880, Sec. 5, 72nd Leg., R.S. (1991) V.T.S.L.S. Chapter 838.

1. Appellant's twenty-third point of error states:

The trial court erred in refusing to admit evidence relating to the background of the victim thereby depriving the jury of the full range of evidence that may be considered in the decision as to whether the death penalty was the appropriate punishment for the appellant.

*ter,* 888 P.2d 629, 651 (Utah 1995), which held:

> permitting the State to introduce victim impact evidence shifts the focus of the proceeding from the defendant to the victim and the effect of the murder on the victim's family and community. This shift adds nothing to the culpability analysis and is fraught with danger. [Citation omitted.] Aside from causing the jury to lose sight of its immediate task, the shift suggests that some victims are more valuable to society and/or deserve more sympathy than others.

The *Carter* Court thereafter held that victim impact evidence simply has no probative force in the sentencing context.

> Such evidence does not make it more or less likely that a defendant deserves the death penalty. In our society, individuals are of equal value and must be treated that way. We will not tempt sentencing authorities to distinguish among victims—to find one person's death more or less deserving of retribution merely because he or she was held in higher or lower regard by family and peers. Such a scheme draws lines in our society that we think should not be drawn. The worth of a human life is inestimable, and we do not condemn those who take life more or less harshly because of the perceived value or quality of the life taken. [Citation omitted.] Indeed, society is probably incapable of evenhandedness in such judgments.

*Id.,* 888 P.2d at 652.

In the instant case, had the trial judge permitted evidence of the victim's homosexuality, the jury would have been asked to find that appellant was less deserving of death because his victim was less deserving of life. Although *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), holds that the admission of victim impact evidence is not intended to re-focus the trial upon the

victim's character, or to encourage comparative judgments between victims, 501 U.S. at 823, 111 S.Ct. at 2607, it is clear that by concentrating on the victim's personal characteristics, or the results of the offense upon the survivors, the jury will inevitably, if unintentionally, base their judgment in part upon the victim's personal achievements (or failures) and the number of people impacted by the crime. *Alvarado v. State,* 912 S.W.2d 199, 223 (Tex.Cr.App.1995) (Baird and Meyers, JJ., concurring). Moreover, if such evidence were admissible under art. 37.071 and the State were permitted to introduce evidence of the victim's value to society, the defense must be permitted to rebut that showing with degrading evidence tending to demonstrate lack of worth. *Id.,* 912 S.W.2d at 224 (quoting *Carter,* 888 P.2d at 652). For these reasons *Payne* accomplishes the unintended, it encourages comparative judgments between victims. Because of its internal contradictions *Payne* is unworkable in a society that values the worth and dignity of each human being.

### II.

Additionally, I categorically reject appellant's argument that homosexuals are less valuable members of society and, therefore, appellant is less deathworthy for taking a homosexual's life. Appellant's argument ignores the fact that every member of our society has the unalienable right to *not* be victimized by criminal conduct.[2]

Although appellant fails to explain how homosexuality decreases a person's value or how a victim's homosexuality should mitigate the punishment for a crime,[3] appellant's argument is clearly based on the erroneous assumption that certain members of our society are inferior to others. Similar arguments have been rejected. *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880).

**2.** All members of our society possess certain unalienable rights, including life, liberty and the pursuit of happiness. The Declaration of Independence para. 2 (U.S.1776).

**3.** Under our capital sentencing scheme, defendants are entitled to present evidence that mitigates against the imposition of the death penalty. Tex.Code Crim.Proc.Ann. art. 37.071(2)(a). *See*

*also, Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (The Supreme Court acknowledged the assurance that this Court would interpret Tex.Code Crim.Proc.Ann. art. 37.071 "so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show.").

*See also, Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *and, Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). For example, in *Strauder,* the Supreme Court rejected the argument that "colored people" were inferior to other members of society. *Strauder,* 100 U.S. at 308.[4]

If appellant's argument prevailed, future defendants would be entitled to argue that their victims were less valuable members of society because of their age, race, gender, religion or socioeconomic status. Instead, society so abhors appellant's argument that those who perpetrate crimes based on a victim's group affiliation, such as homosexuality, may be punished *more* severely. *See,* Tex. Code Crim.Proc.Ann. art. 42.014 and Tex. Penal Code Ann. § 12.47.[5] There is no place in an enlightened society for one to believe that perpetrating a crime on an individual is less reprehensible because of the victim's age, race, gender, religion, sexual orientation or socioeconomic status. In short, evidence of the victim's homosexuality has no *mitigating* value.

With these comments, I join the majority opinion to the extent it holds victim impact evidence is inadmissible as a matter of law.

## OVERSTREET, Judge, concurring.

I concur in the result reached by the Court that appellant's conviction be affirmed. For the reasons advanced in *Ford v. State,* 919 S.W.2d 107 (Tex.Cr.App.1996) and the following reasons, I write to distinguish my beliefs.

In *Ford, supra,* 919 S.W.2d at 112–14, this Court for the first time approved the admissibility of so-called "victim impact" evidence at the punishment stage of a capital murder trial. We determined that what was critical in the determination of admissibility of such evidence was its relevance as to the special issues which the sentencing jury is required to answer per Articles 37.071 and 37.0711, V.A.C.C.P., and within the confines of our rules governing evidence admissibility, particularly Tex.R.Crim.Evid. 401, 402 and 403. Thus the principal concern regarding the admissibility of victim impact evidence at the punishment stage of a capital murder trial is its relevancy regarding the special issues which the sentencing jury is required to answer. If the trial court can conclude that evidence regarding the impact of the murder on the victim's family is relevant to the jury's decision in answering the statutory special issues, and that its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, undue delay, or needless cumulation of evidence, then such evidence would be admissible under the rules of evidence. Tex.R.Crim.Evid. 401, 402 and 403. Thus any and all evidence of the impact upon a victim is not necessarily admissible; such must be *relevant* to the statutory special issues within the parameters of the our evidentiary rules.

I also observe that Chapter 56 of the Code of Criminal Procedure, which deals with crime victims' rights, includes close relatives of deceased victims and guardians of victims

---

4. Additionally, several jurisdictions have specifically rejected the discrimination against homosexuals. *See, Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44 (1993) (Same-sex couples may have an equal protection right under the Hawaii Constitution to marry.); *In re custody of H.S.H.-K.,* 193 Wis.2d 649, 533 N.W.2d 419 (1995) (Biological mother's former same-sex partner may be entitled to visitation rights of the child both were raising.); *In re B.L.V.B.,* 160 Vt. 368, 628 A.2d 1271 (1993) (Homosexual couples are permitted to adopt.). And, most recently, the Supreme Court held any governmental discrimination against homosexuals violates the Equal Protection Clause of the Fourteenth Amendment absent proof that such discrimination bears a rational relationship to a legitimate end. *Romer v. Evans,* —— U.S. ——, ——, 116 S.Ct. 1620, 1625, —— L.Ed.2d —— (1996).

5. Art. 42.014 provides:

In the punishment phase of the trial of an offense under the Penal Code, if the court determines that the defendant intentionally selected the victim primarily because of the defendant's bias or prejudice against a group, the court shall make an affirmative finding of that fact and enter the affirmative finding in the judgment of that case.

Section 12.47 provides:

If the court makes an affirmative finding under Article 42.014 Code of Criminal Procedure, in the punishment phase of the trial of an offense other than a first degree felony, the punishment for the offense is increased to the punishment prescribed for the next highest category of offense.

within its treatment of victims' rights. Obviously in a capital murder case the "victim" is deceased and the impact upon that "victim" is death. Since Chapter 56 includes close relatives of deceased victims and guardians of victims within its scope, and *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) involved a surviving close relative of the decedent, i.e. specifically her young child, I believe that potentially admissible victim impact evidence should be limited to the impact upon close relatives and guardians of the deceased victim. Article 56.01, V.A.C.C.P., defines "[c]lose relative of a deceased victim" to be:

a person who was the spouse of a deceased victim at the time of the victim's death or who is a parent or adult brother, sister, or child of the deceased victim.

Art. 56.01 defines "[g]uardian of a victim" to be:

a person who is the legal guardian of the victim, whether or not the legal relationship between the guardian and victim exists because of the age of the victim or the physical or mental incompetency of the victim.

Though Chapter 56 does not specifically deal with the admissibility of evidence during the punishment stage of a capital murder trial, it does provide some guidance as to parameters in determining such admissibility. It does leave open some issues as to the impact upon people who were close to the decedent, but who do not fit the definition of close relative or guardian, such as a grandparent or grandchild, fiancee, unmarried live-in lover, or same-sex "companion." Because of the potential open-endedness in determining who can provide such victim impact evidence, I believe that it is best limited to the persons described in Art. 56.01 and in the particular circumstance of *Payne*.

I also must state that I strongly believe that the character of the victim (victim character evidence), good or bad, is never admissible for the purpose of placing some sort of value (positive or negative) on the life of the victim. *Payne v. Tennessee, supra,* 501 U.S. at 823, 111 S.Ct. at 2607, 115 L.Ed.2d at 734 (1991) even addresses this concern about the prospect of the admission of victim impact evidence permitting a jury to find that defendants whose victims were assets to the community are more deserving of harsh punishment than those whose victims are perceived to be less worthy. It states:

As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

[Emphasis in original.] Thus, per *Payne*, "[a]s a general matter," such comparative judgment is totally inappropriate; and no evidence, victim impact or otherwise, should be offered or admitted that would encourage such. Thus, in the instant cause, the trial court properly excluded appellant's evidence proffered to show that the decedent's homosexuality mitigated against a death sentence for appellant.

With these thoughts, I join only the judgment of the Court.

MANSFIELD, Judge, concurring.

I concur in the result. With respect to appellant's point of error number twenty, it is my opinion that the testimony of the director of the rehabilitation program at Star House where the complainant was employed at the time of his death was not victim impact evidence as contemplated by the Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The testimony—which was brief—was that the complainant had done well in a state hospital drug rehabilitation program which was why the director considered him as a good candidate for the internship program at Star House. There was no testimony as to the complainant's character or that he was a "good person." Accordingly, the State "did not open the door" to evidence of the complainant's bad character, i.e. his prior convictions.

With respect to appellant's point of error number twenty-two, it is my opinion that the sexual preference of the victim in a capital murder trial is irrelevant and thus inadmissible if, at the time of the commission of the offense, the defendant did not know the sexual preference of the victim. The victim's sexual preference would only be relevant, and admissible as such, if it is shown by the defendant, at the guilt-innocence phase, that the victim's sexual preference was a significant factor in his defense. Such a determination should be made by the trial court outside the presence of the jury. See *Nelson v. State*, 848 S.W.2d 126 (Tex.Crim.App. 1992), *cert. denied*, 510 U.S. 830, 114 S.Ct. 100, 126 L.Ed.2d 66 (1993).